**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| | : | |
| **ADAM ANKELE** | : | |
| **Plaintiff** | : | **CIVIL ACTION** |
| | : | **No. 02-4004** |
| **v.** | : | |
| | : | |
| **MARCUS HAMBRICK** | : | |
| **Defendant** | : | |
| | : | |

<u>**MEMORANDUM OPINION**</u>

**RUFE, J.**                                                                                    **May 7, 2003**

     This is a federal civil rights action brought against a Pennsylvania State Police Trooper, Marcus Hambrick ("Hambrick"), in his individual capacity. Plaintiff Adam Ankele ("Ankele") contends that Hambrick violated his Fourth and Fourteenth Amendment rights under the U.S. Constitution following a February 12, 2001 vehicle accident and subsequent investigation. Presently before the Court is Defendant Hambrick's Motion for Summary Judgment as to all of Ankele's claims. For the reasons set forth below, Hambrick's Motion for Summary Judgment is granted in part and denied in part.

**I.**     <u>**BACKGROUND**</u>

     The following factual account is taken in a light most favorable to Ankele as he is the non-moving party on the instant motion for summary judgment. On February 12, 2001, Ankele left work at 4:00 p.m. after working the 7:00 a.m. to 3:30 p.m. shift. <u>See</u> Ankele Deposition Transcript at 8-9, attached to Defendant's Motion (hereinafter "Ankele Dep."). Ankele stopped at a bar called the Rittersville Fire Company at approximately 4:00 p.m. in order to meet a friend. While waiting for

his friend Ankele consumed three ten-ounce glasses of beer, and ate no food.  Id. at 11-12, 16, 21.

When Ankele's friend did not arrive by 5:30-6:00 p.m., Ankele left the bar to go home.  Id. at 15,

17, 24.  The bartender working that afternoon, Jonathan Christman, testified at Ankele's trial on the

DUI charge that he did not observe any of the behavior that he had witnessed on prior occasions

when he knew Ankele was intoxicated, such as slurring his speech and laughing a lot.  See Trial

1/18/02 N.T. of Testimony of Jonathan Christman, at 11-12 (hereinafter "Christman").  Christman

also testified that based on his observations of Ankele that afternoon, he would have volunteered to

be a passenger in Ankele's car.  Id. at 10.

At approximately 6:30 p.m., Ankele crashed into the rear of a car stopped at a red light at

the intersection of Tilghman Street and Blue Barn Road, in Upper Macungie Township,

Pennsylvania.  Ankele Dep. at 8, 25; Police Accident Report at 1, attached to Ankele Dep. at Ex. 2

(hereinafter "Police Report").  Ankele admits that he was not paying attention to the road in front

of him when he struck the other automobile at a speed of 15-20 mph.  Ankele Dep. at 25-26.  Ankele

then drove his vehicle away from the site of impact, which was in the middle of the road, and into

the parking lot of the Kuhnsville Inn, located across the street.  Id. at 27, 31-32; 1/18/02 Trial N.T.

of Ankele at 12 (hereinafter "Ankele Test.").  From this time forward, witness accounts of events

vary, but the Court will continue to set forth Plaintiff's version, as he is the non-moving party.

Ankele exited the car, inspected the damage to his vehicle, paced back and forth, sat on a

curb close to his vehicle, composing himself and smoking a cigarette.  Ankele Dep. at 33; Ankele

Test. at 14-15.  At this time a bystander who had witnessed the accident, Michael Wieder,

approached Ankele and asked if he was alright.  Ankele Dep. at 34.  Wieder testified at Ankele's

trial that Ankele was walking away from the scene, perhaps attempting to leave the scene altogether,

but that Ankele slowed down and stopped when he realized that Wieder was behind him. 1/18/02 Trial N.T. of Michael Wieder at 9, 27, attached to Defendant's Motion (hereinafter "Wieder Test."). Ankele admits that Wieder told Ankele that he had an obligation to return to the accident scene. Ankele Dep. at 74. During this conversation, Wieder noticed nothing out of the ordinary in Ankele's speech or walking. See Wieder Test. at 26. In addition, Wieder did not smell alcohol on Ankele's breath while standing about three feet away from him, see id. at 26-27, but when asked "could you tell he had been drinking?", Wieder responded that "from what I saw, I would say he was." Id. at 10-11.

During this conversation between Ankele and Wieder, Defendant State Police Trooper Hambrick arrived at the accident scene to investigate. Ankele Dep. at 37. Wieder then escorted Ankele across the street and back to the site of impact. Hambrick saw both men crossing the street, and noted that Ankele was walking with a "staggered gait." See Deposition of Marcus Hambrick at 12, attached to Defendant's Motion (hereinafter "Hambrick Dep."). When crossing the street with Ankele, Wieder did not notice anything unusual about Ankele's manner of walking. However, he testified that he was not paying close attention to Ankele because he was looking out for oncoming traffic. Wieder Test. at 31-32.

As Ankele and Wieder crossed the street, Hambrick was speaking to the driver of the other vehicle involved in the accident, Mr. Robert Woods. Ankele Dep. at 36, Police Report at 1. As soon as Ankele arrived at the location of the accident, he stood by the police cruiser, smoking a cigarette. See Ankele Test. at 18. Hambrick walked toward Ankele, and asked him if he was the other driver involved in the accident. Id. at 40. At this time Ankele began backing away from Hambrick because he found Hambrick to be "a very intimidating person." Ankele Test. at 19. Ankele

responded "yes," and immediately thereafter Hambrick "grabbed [Ankele], threw [Ankele] on the back of the [police] car, ripped everything out of [Ankele's] pockets and immediately handcuffed [Ankele] and put [Ankele] in the back of the [police] car." Ankele Dep. at 40. Wieder's testimony tends to corroborate Ankele's contention that the verbal exchange and subsequent handcuffing occurred in a very short time span. Wieder Test. at 28 ("By the time I turned around . . . he was on the hood of the car. . . "). Ankele claims that Hambrick "grabbed me and slammed me on the car," and that this resulted in "soft tissue injuries" to his body. Ankele Dep. at 42; Complaint ¶ 12. As a result, Plaintiff was "sore" for about a week. Ankele Dep. at 44, 112. Wieder testified that throughout this incident Ankele was not verbally abusive, Wieder Test. at 33. Ankele contends that he did not argue with Hambrick, although he admits saying "What are you f----ing crazy? I was just in an accident!" when Hambrick grabbed him. Ankele Dep. at 46.

Ankele admits that he told Hambrick that he had been drinking alcohol, but it is not clear from the record whether he made this statement before or after being taken into custody. Ankele Dep. at 69, 105. Ankele contends that Hambrick never asked him to perform field sobriety tests before taking him into custody. Ankele Test. at 20-21.[1]

---

[1] Officer Hambrick provides a different version of events, which the Court will summarize for purposes of demonstrating the significant factual disputes presented in this case. First, Hambrick claims that he asked Ankele if he had been drinking, and that he asked him for his driver's license. He claims Ankele admitted to drinking, and that Ankele could not produce a driver's license. Hambrick Dep. at 23, 32-33. Hambrick contends that upon observing and speaking with Ankele, several factors led him to believe that Ankele was intoxicated, including "staggered gait, red, bloodshot eyes, an odor of alcoholic beverages about his breath and person, he was involved in a crash." Id. at 40. Therefore, he decided to administer field sobriety tests. Id. at 23. (However, Hambrick provided a different version of events when he testified at Ankele's preliminary hearing. There, he stated that he decided to forego field sobriety tests because he believed that he already had probable cause to arrest. See infra.) Pursuant to his ordinary procedure, Hambrick asked Ankele to bend over the police cruiser, place his hands on the hood of the police cruiser, and submit to a frisk for weapons. Ankele complied, and Hambrick began conducting a pat-down. During the frisk Ankele began to stand up and twist away from Hambrick. Hambrick found this action threatening, and so he put his weight into Ankele's back, pulled Ankele's hands behind his back, and handcuffed him. Hambrick also contends that Ankele was belligerent and cursing loudly. Id. at 23-29.

4

Ankele was arrested for driving under the influence of alcohol ("DUI") in violation of 75 Pa. Cons. Stat. Ann. § 3731(a)(1); leaving the scene of an accident in violation of 75 Pa. Cons. Stat. Ann. § 3743(a); and driving at an unsafe speed in violation of 75 Pa. Cons. Stat. Ann. § 3361. Hambrick transported Ankele in custody to the Fogelsville police barracks, and asked him to submit to a "breathalyzer" test. Ankele complied with Hambrick's requests, blowing breath samples into a tube connected to a machine, the Intoximeter Alco-Sensor IV, which determines blood-alcohol content. Ankele blew four to five samples into the tube. Ankele recalls the machine's printer, the RBT IV, printed slips, or a "little white receipt," upon completion of each breath sample. When Ankele asked Hambrick what the reading was, Hambrick stated that the machine was not printing out a reading. Ankele also claims that Hambrick threw the slips of paper into the trash. Hambrick then asked Ankele to sign a refusal form. Ankele did not sign the form, because he felt that he had complied with the instructions given by Hambrick. Ankele Dep. at 49-51.

The preliminary hearing before a district justice on the criminal charges was held on June 6, 2001. There, Hambrick attempted to bolster his claim that Ankele refused the breath test by testifying that another police officer, Trooper Campbell, was present during the entire time that Ankele submitted to the tests. 6/6/01 Preliminary Hearing Transcript at 22, attached to Plaintiff's Appendix at Ex. 6 (hereinafter "Prelim. Hrg."). Hambrick changed this story during his deposition in this case, when he admitted that Trooper Campbell was not present through the completion of the breath test, and was present for only a "small portion of it." Hambrick Dep. at 51.

Moreover, Hambrick testified at the preliminary hearing that he did not conduct field sobriety tests at the scene of the accident because he felt he "had enough to ask him to come back to Fogelsville" based on the fact that he was in an accident, his gait, bloodshot eyes, "moderate odor

5

of alcohol." Prelim. Hrg. at 16.  However, Hambrick changed this story during his deposition in this case, where he claimed that he asked Ankele to perform field sobriety tests at the scene of the accident, but did not follow through because he felt "threatened" by Ankele when Ankele stood up and began to "spin away" during a frisk, and that he was concerned that Ankele might try to harm him.  Hambrick Dep. at 23, 26, 28.

Thereafter, Hambrick testified a third time at Ankele's license suspension appeal hearing on January 14, 2002.  During his testimony, Hambrick testified that Ankele never gave a sufficient breath sample.  See N.T. of License Suspension Appeal at 30-31, attached to Plaintiff's Appendix at Ex. 5 (hereinafter "License Appeal").  In order to explain the absence of a refusal slip from the machine, Hambrick testified that a refusal slip is not always printed out by the machine.  Id. at 26. Hambrick now claims in this action that he mistakenly turned the machine off before any slip, neither confirming nor denying that a refusal to submit to a breath test, was printed.  Hambrick Dep. at 70, 73, 80.  The state court trial judge apparently rejected Hambrick's version of the events as the suspension of Ankele's drivers license was lifted.[2]  A jury found Ankele was not guilty of DUI, and he was not convicted of the other charges.  Id. at 100.

Ankele then filed this action under 42 U.S.C. § 1983, and asserts three counts in his Complaint: (1) illegal arrest; (2) excessive use of force; and (3) violation of his due process rights. This Court has jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331, 1343.  Hambrick now moves the Court for summary judgment as to all of Ankele's claims.

---

[2]  The Court notes that neither party has supplied the Court with complete transcripts of the state proceedings, including the preliminary hearing, criminal trial on the DUI charge and the civil license suspension hearing.

## II.    SUMMARY JUDGMENT STANDARD

This Court will enter summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The non-moving party has the burden of producing evidence to establish each element of its claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the case under the governing substantive law. See Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986). In order for there to be "a genuine issue of material fact," the evidence must be such that "a reasonable jury could return a verdict for the nonmoving party." Id. The court determines whether there is a sufficient factual disagreement or whether "it is so one-sided that one party must prevail as a matter of law." Id. at 251-52. In determining whether Hambrick is entitled to judgment as a matter of law, this Court will continue to view the evidence, and draw all reasonable inferences, in a light most favorable to Ankele, the non-moving party. See Dici v. Com. of Pa., 91 F.3d 542, 547 (3d Cir. 1996).

## III.    DISCUSSION

This civil rights case engenders the interplay between the interests of Ankele, and his rights under the Fourth and Fourteenth Amendments to the Constitution of the United States, and of Hambrick, and his right to be free of personal liability for actions taken while acting under color of state law. Hambrick asserts his privilege of qualified immunity against Ankele's charges.[3] As the Supreme Court has noted, this doctrine provides Hambrick with "an immunity from suit rather than

---

[3] Plaintiff asserts in his Opposition to Defendant's Motion for Summary Judgment that Hambrick does not present a "real argument" for qualified immunity. Regardless of how Plaintiff characterizes Hambrick's Motion, there is no question that Hambrick raises the qualified immunity issue, and the Court must consider it.

a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Saucier v. Katz, 533 U.S. 194, 201 (2001). Therefore, the Court will turn to the issue of whether Hambrick is entitled to qualified immunity.

The Supreme Court of the United States held in Saucier that the ruling on qualified immunity must be undertaken separately from the constitutional inquiry. Id. at 197. Accordingly, the following two-step analysis is required to ensure that the goal of qualified immunity, i.e., to avoid unnecessary disruption of government and to resolve insubstantial claims, is effectuated. Id. at 202.

The framework announced in Saucier requires this Court to begin its analysis by considering whether the facts alleged, taken in the light most favorable to the plaintiff, show that the officer's conduct violated a constitutional right. See id. at 201. If the plaintiff fails to make out a constitutional violation, the qualified immunity inquiry is at an end," and the officer is entitled to immunity. Bennett v. Murphy, 274 F.3d 133, 136 (3d Cir. 2001).

If, however, "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." Saucier, 533 U.S. at 201. "The relevant dispositive inquiry" in making this determination is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 202. This does not entail identifying a generalized, abstract constitutional right such as the right to be free from unreasonable seizures. Rather, it requires that the Court determine on a more "particularized" level that it was "sufficiently clear that a reasonable official would understand that what he [was] doing violates that right." Id. Whether the facts alleged support a claim of a violation of clearly established law is a "purely legal" question for the Court. Johnson v. Jones, 515 U.S. 304, 313 (1995).

8

Even where the plaintiff can establish that the officer violated a clearly established right, the officer is still entitled to qualified immunity if the officer can establish that he "mistakenly but reasonably believed that his actions were constitutionally permissible." Hung v. Watford, No. 01-3580, 2002 WL 31689328, at *2 (E.D. Pa. Dec. 3, 2002).  The Court must answer this question affirmatively if Hambrick either 1) correctly perceived all of the relevant facts but had a mistaken understanding as to whether his actions were constitutionally permissible, or 2) had reasonable, but mistaken beliefs that facts warranted his conduct. See id. (discussing qualified immunity and excessive force claim); see also Saucier, 533 U.S. at 206.  "If there is no genuine issue of fact as to whether defendant acted with such a reasonable but mistaken belief, then he is entitled to qualified immunity regardless of whether his actions actually were constitutional." Hung, 2002 WL 31689328, at *2 (citing Saucier, 533 U.S. at 206).

This determination must be made considering the facts in the light most favorable to Ankele. If there is a genuine issue of material fact regarding the reasonableness of Hambrick's belief that probable cause existed under the circumstances, he is not entitled to qualified immunity. See id. at n.6; see also Paff v. Kaltenbach, 204 F.3d 425, 437 (3d Cir. 2000) (court must ask whether officer unreasonably mistook his action as reasonable in the face of "apparent" law to the contrary).  As the Third Circuit recently explained in a case involving excessive use of force:

> *Saucier*'s holding regarding the availability of qualified immunity at the summary judgment stage does not mean that an officer is precluded from arguing that he reasonably perceived the facts to be different from those alleged by the plaintiff.  An officer may still contend that he reasonably, but mistakenly, believed that his use of force was justified by the circumstances as he perceived them; this contention, however, must be considered at trial.

Bennett v. Murphy, 274 F.3d 133, 137 (3d Cir. 2002).  With these standards in mind, the Court will

proceed to analyze Ankele's claims.

### A.    FOURTH AMENDMENT

Ankele alleges that Hambrick violated his Fourth Amendment right to be free from unreasonable seizures by effectuating an arrest without probable cause, and by using excessive force when he placed him under arrest.  Each claim is discussed below.

### 1.    PROBABLE CAUSE

Probable cause is not needed on each and every offense that could be charged; probable cause is only needed for one of the offenses that may be charged under the circumstances.  Barna v. City of Perth Amboy, 42 F.3d 809, 819 (3d Cir. 1994); see also United States v. Bookhart, 277 F.3d 558, 565 n.10 (D.C. Cir. 2002) (collecting cases holding same); cf. United States v. Bizier, 111 F.3d 214, 218 (1st Cir. 1997) ("a finding of probable cause for any offense justifying full custodial detention can validate the search in this case as incident to a lawful arrest").  Here, Ankele was charged with three offenses: DUI, leaving the scene of an accident, and driving at an unsafe speed. Thus, if Hambrick had probable cause to arrest for any of these charges, he is entitled to summary judgment on Plaintiff's unlawful arrest claim.

Defendant asks this Court to dismiss Count 1 of the Complaint ("Illegal Arrest") because it does not specifically allege that the arrest was illegal insofar as it was undertaken for leaving the scene of the accident.  Rather, Ankele only challenges the validity of the arrest insofar as it was carried out without probable cause to arrest for DUI.  See Complaint ¶¶ 5-9.  Defendant contends that this fact alone entitles him to summary judgment.  Although Plaintiff's Complaint is inartfully drafted, this shortcoming is not sufficient to justify summary judgment in favor of Hambrick on Ankele's "Illegal Arrest" claim.

10

There is no support in the record for the notion that Hambrick arrested Ankele for leaving the scene of the accident. To the contrary, nowhere does Hambrick represent that on the evening in question he arrested Ankele for leaving the scene of the accident (or for driving at an unsafe speed). Rather, his deposition testimony focuses almost exclusively on his belief that the facts available to him at the accident scene gave rise to probable cause to arrest for DUI. See Hambrick Dep. at 19-33.

In his pleadings before this Court, Hambrick now contends that the arrest for leaving the scene was valid. However, Hambrick surely lacked legal authority to arrest Ankele for leaving the scene of the accident, and to the extent that the arrest was carried out for this violation of the Motor Vehicle Code, it was illegal.[4]

The Pennsylvania Motor Vehicle Code bars Hambrick from making an arrest for leaving the scene of an accident in these circumstances. Under 75 Pa. Cons. Stat. Ann. § 6304(a), a member of the Pennsylvania State Police may arrest a person *without a warrant* for a violation of the Motor Vehicle Code only if (1) the officer is in uniform, and (2) the Motor Vehicle Code is violated "in the presence of the police officer making the arrest." See also Commonwealth v. Kiner, 697 A.2d 262, 267-68 (Pa. Super. Ct. 1997) (section 6304(a) is "a general provision regarding arrest powers under the Motor Vehicle Code"); Commonwealth v. Karl, 476 A.2d 908, 911 (Pa. Super. Ct. 1984) ("York police officers did not have the authority to make a lawful arrest for 'hit and run' - - that is, leaving the scene of an accident after hitting an unattended vehicle - - because the incident did not occur in the presence of the officers."). There is no evidence in the record showing that Ankele left

---

[4] This statement should not be read as a finding of liability on Count 1. As noted, Plaintiff's Complaint does not pursue a cause of action for "Illegal Arrest for Leaving the Scene" or "Illegal Arrest for Driving at an Unsafe Speed." Rather, the Complaint allegations are limited to charging Hambrick with carrying out an illegal arrest for DUI because he lacked probable cause to arrest for DUI.

the scene of the accident while Hambrick was present. In fact, it is undisputed that Hambrick arrived some time after Ankele parked his car in the parking lot and, as Wieder testified, began walking away from the general area.

Similarly, as to the third charge, Hambrick also would have been without authority to arrest Ankele for driving at an unsafe speed under 75 Pa. Cons. Stat. Ann. § 3361 because there is no evidence in the record to support such a claim. In fact, Hambrick admitted that no one complained about Ankele's speed prior to the accident. Hambrick Dep. at 94-95. Likewise, a police officer may issue a summary offense citation for a violation of the Motor Vehicle Code only if he has observed it himself or after an investigation of an incident, which clearly did not occur here. Therefore, there existed no grounds to arrest Ankele for driving at an unsafe speed in violation of 75 Pa. Cons. Stat. Ann. § 3361.

Therefore, even though Ankele may have failed to contest the arrest on these specific grounds in his Complaint, it is clear that Hambrick lacked legal authority to carry out the arrest for these alleged violations. Accordingly, the Court will not enter judgment in favor of Defendant on Ankele's Illegal Arrest on this ground alone. Rather, it will consider the merits of Ankele's claim that Hambrick lacked probable cause to arrest for DUI.

It is axiomatic that the "Fourth Amendment prohibits arrests without probable cause." Walker v. West Caln Township, 170 F. Supp. 2d 522, 526 (E.D. Pa. 2001). In determining whether a constitutional violation exists, the Court will look to whether "the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." Merkle v. Upper Dublin School Dist., 211 F.3d 782, 788 (3d Cir. 2000) (citation omitted). Generally, the

question of probable cause in a § 1983 damages suit is one for the jury, and this is "particularly true where the probable cause determination rests on credibility conflicts." Id. "The proper inquiry in a section 1983 claim based on false arrest . . . is not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense." Dowling v. City of Philadelphia, 855 F.2d 136, 141 (3d Cir. 1988).

Because Hambrick asserts qualified immunity against Ankele's claim, the Court must first determine whether the facts alleged make out a constitutional violation, and it must examine those facts in the light most favorable to the Ankele. See Saucier, 533 U.S. at 201. That is, based on Ankele's version of events, as supported by record evidence that a reasonable jury might credit at trial, did Hambrick arrest Ankele for DUI without sufficient probable cause? The plaintiff bears this initial burden of showing a constitutional violation. Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997).

Here, Plaintiff presents the following evidence. When Hambrick arrived at the scene of the accident, Ankele and Wieder were talking in the parking lot of the Kuhnsville Inn, and soon after began making their way across the street toward the scene of the accident. When Ankele first interacted with Hambrick near the police cruiser, Hambrick asked him if he was the other driver involved in the accident, to which Plaintiff answered in the affirmative. Hambrick then immediately grabbed Plaintiff, slammed him onto the trunk of the cruiser, and placed him in handcuffs. Although Wieder did not see this occur, he confirms that very shortly after they arrived at the accident scene Hambrick had Ankele "on the hood of the car." Wieder Test. at 28.

Ankele disputes Hambrick's testimony that he had any trouble walking across the street, or that he was staggering, although he concedes that his wife has described his natural walk as "goofy"

13

or as a "limp." Ankele Dep. at 38-39. Wieder testified that he noticed nothing unusual about Ankele's walk as they proceeded across the road from the parking lot.

Although Hambrick testified that Ankele's eyes were red or blood-shot, both Hambrick and Ankele testified that it was dark at the time of their encounter. Hambrick Dep. at 7, Ankele Dep. at 104. Ankele testified that Hambrick did not shine a light in his face, although there may have been streetlights nearby or over the intersection. Id. at 104-05. Hambrick contends that he smelled a "moderate odor of alcohol" about Ankele, Prelim. Hrg. at 16, but both Ankele and Wieder (who stood only three feet from Ankele) testified that there was no such odor present. Ankele Dep. at 70; Wieder Dep. at 26. No field tests were administered.

Accordingly, the Court must ask whether the objective facts available to Hambrick, as presented by Plaintiff's evidence, "warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." Merkle, 211 F.3d at 788. The Court concludes that it does not. As related by Plaintiff's version, Hambrick observed a man walking unimpeded across the street, perhaps with a "limp."[5] Taken in the light most favorable to Plaintiff, the facts presented at least raise the inference that it was too dark for Hambrick to see the color or quality of Ankele's eyes, and that there was no noticeable odor of alcohol about him. A reasonable jury might discredit Hambrick's testimony about the odor of alcohol, and credit Wieder's testimony to the contrary.[6] Upon confronting Ankele, Hambrick asked him if he was the driver of the other vehicle

---

[5] Although not argued by Plaintiff, the Court observes that a reasonable person in Hambrick's position could just as easily conclude that a person limping toward an accident scene is perhaps exhibiting signs of an injury sustained in the accident.

[6] Although Wieder's observations in the parking lot led him to believe that Ankele had been drinking, he did not communicate this conclusion to Hambrick before Ankele's arrest. Therefore, Wieder's observations were not "objective facts available to" Hambrick at the time he placed Ankele under arrest. Merkle, 211 F.3d at 789.

14

in the accident. When Ankele responded "yes," Hambrick placed him under arrest. Based on this evidence, and taking the evidence in the light most favorable to Ankele, the Court cannot conclude that Hambrick had sufficient knowledge to warrant a reasonable belief that Ankele had been driving "[w]hile under the influence of alcohol to a degree which renders the person incapable of safe driving." 75 Pa. Cons. Stat. Ann. § 3731(a). Cf. Merkle, 211 F.3d at 788 (noting that question of probable cause is usually one for the jury, particularly where credibility determinations are at issue). Accordingly, these facts make out a constitutional violation under the Fourth Amendment.

Turning to the next step in the Saucier analysis, the Court must ask whether the contours of the constitutional right were clearly established on February 12, 2001, *i.e.*, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." 533 U.S. at 202. In other words, would it be clear to a reasonable officer investigating an accident on February 12, 2001 that it is unlawful to make an arrest for DUI when he observes an individual walking with a limp (but otherwise unimpeded) toward the scene of an accident, has no odor of alcohol about him, it is too dark to see that person's eyes, and that person merely confirms that he was involved in the accident? The Court is of the opinion that it was clearly established that such an action was unlawful at that time, and Hambrick cites no cases to the contrary. Compare Commonwealth v. Klingensmith, 650 A.2d 444, 458 (Pa. Super. Ct. 1994) (police had probable cause to arrest when police observed that defendant had blood-shot eyes, smelled of alcohol, and failed field sobriety tests), allo. denied, 659 A.2d 986 (Pa. 1995); Commonwealth v. Dungan, 539 A.2d 817, 822 (Pa. Super. Ct.) (police had probable cause to arrest for DUI where police discovered alcohol at scene of accident, spoke with other drivers on the road who observed defendant's driving prior to accident, interviewed bartender who served drinks to defendant earlier that day, confirmed

15

that defendant was the driver of the vehicle, and ambulance attendants smelled odor of alcohol), <u>allo.</u> <u>denied</u>, 559 A.2d 34 (Pa. 1988).

Even though Ankele has established that Hambrick violated a clearly established right, Hambrick is still entitled to qualified immunity if he can establish that he "mistakenly but reasonably believed that his actions were constitutionally permissible." <u>Hung</u>, 2002 WL 31689328, at *2. The Court must answer this question affirmatively if Hambrick either 1) correctly perceived all of the relevant facts but had a mistaken understanding as to whether he had probable cause to arrest Ankele for DUI, or 2) had reasonable, but mistaken beliefs that facts gave rise to probable cause to arrest for DUI. <u>See</u> <u>id.</u> "If there is no genuine issue of fact as to whether defendant acted with such a reasonable but mistaken belief, then he is entitled to qualified immunity regardless of whether his actions actually were constitutional." <u>Id.</u> This determination must be made considering the facts in the light most favorable to Ankele. If there is a genuine issue of material fact regarding the reasonableness of Hambrick's belief that probable cause existed under the circumstances, he is not entitled to qualified immunity. <u>See</u> <u>id.</u> at n.6; <u>see also</u> <u>Bennett</u>, 274 F.3d at 137 ("An officer may still contend that he reasonably, but mistakenly, believed that his use of force was justified by the circumstances as he perceived them; this contention, however, must be considered at trial.").

On the present record, there are substantial unresolved questions of material fact on this issue. The parties dispute almost every fact surrounding the circumstances that could have given rise to probable cause. These include whether Ankele had an odor of alcohol about him; whether his gait would lead a person to believe he was intoxicated as opposed to just limping; whether his eyes were bloodshot; whether Hambrick asked him to perform field sobriety tests; and whether Ankele admitted to Hambrick, prior to the arrest, that he had been drinking. Because there are

16

genuine issues of material fact regarding the reasonableness of Hambrick's belief that probable cause existed under the circumstances to arrest Ankele for DUI, he is not entitled to qualified immunity for Plaintiff's claim arising from the illegal arrest for DUI.[7]

## 2.    EXCESSIVE FORCE

Ankele alleges that Hambrick used excessive force when he pushed Ankele onto the hood of his patrol car and proceeded to handcuff him.  Per the Supreme Court's direction in Saucier, the Court will first ask whether the facts alleged make out a constitutional violation.  533 U.S. at 201. The plaintiff bears this initial burden on this issue.  Sherwood, 113 F.3d at 399.

In Graham v. Connor, the Supreme Court of the United States held that "all claims that law enforcement officers have used excessive force- -deadly or not- -in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment reasonableness standard, rather than under a due process approach.  490 U.S. 386, 395 (1989).  The Graham court stated:

> The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment.  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments- -in circumstances that are tense, uncertain, and rapidly evolving - -about the amount of force that is necessary in a particular situation.
>
> As in other Fourth Amendment contexts, however, the reasonableness inquiry in an excessive force case is an objective one:

---

[7] Defendant attempts to make hay out of the fact that the preliminary hearing judge concluded that there was probable cause to arrest Ankele for DUI.  This is inapposite to the issue presented, however, because the preliminary hearing judge is merely assessing whether the Commonwealth can establish a prima facie case.  See Pa. R. Crim. P. 543(A).  By contrast, this Court must view the evidence in favor of Ankele, not Hambrick, when evaluating qualified immunity.

> the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officers good intentions make an objectively unreasonable use of force constitutional.

Id. at 396-97 (internal cites and quotes omitted).

In determining whether the force used by Hambrick was unreasonable, this Court must consider the totality of the circumstances, including an analysis of "whether the suspect posed an immediate threat to the safety of the officer or others, whether the suspect was actively resisting arrest, and the severity of the crime at issue." See Hung, 2002 WL 31689328, at *5 (citing Curey v, Klem, 298 F.3d 271, 279 (3d Cir. 2002)). The Court is of the opinion that even Ankele's version of events fails to establish that Hambrick used excessive force when arresting him.

Hambrick's actions were objectively reasonable in light of the circumstances surrounding the accident. Plaintiff admits that when Hambrick asked him if he was the other driver involved in the accident, he was backing away from Hambrick. Ankele Test. at 19. Hambrick described the encounter accordingly: "Again, we're doing a little dance. I'm trying to move toward him, he's moving away from me." Hambrick Dep. at 22. It is only after this "little dance" occurred that Ankele alleges Hambrick slammed him over the hood of the patrol car. A reasonable jury could not conclude that this show of force was unreasonable, given the uncertainty presented by Ankele's conduct here. The law cannot condemn such conduct in "circumstances that are tense, uncertain, and rapidly evolving" such as these. Graham, 490 U.S. at 397.

Although pushing Ankele over the hood of the patrol car may have been unnecessary, an allowance must be given to the officer because he was the one confronted with this uncertain

18

situation. See Graham, 490 U.S. at 397. Moreover, the alleged injuries suffered by Ankele are limited to soft tissue injuries, and are not substantiated with any medical documentation. Thus, the force applied here fails to rise to the level of a constitutional violation. See Nolin v. Isbell, 207 F.3d 1253, 1255, 1257 (11th Cir. 2000) (finding no excessive force where officer grabbed plaintiff from behind, threw him against a van three or four feet away, kneed him in the back, pushed his head into the side of the van, and searched his groin in an uncomfortable manner) ("application of de minimis force, without more, will not support a claim for excessive force"); Foster v. Metro. Airports Comm'n, 914 F.2d 1076, 1082 (8th Cir. 1990) (no excessive force where plaintiff was "pushed against a wall twice on the way to the holding area, [but] also testified he sustained no injury as a result of being pushed").

Clearly, the facts alleged by Ankele do not rise to a level of excessive force, and therefore Ankele has failed to make a showing of a constitutional violation. This Court finds that Ankele has not overcome the first barrier to defeating Hambrick's qualified immunity, and Hambrick's motion for summary judgment on Ankele's excessive force claim is granted. See Saucier, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

### B.    FOURTEENTH AMENDMENT

Ankele contends that Hambrick denied his due process rights by destroying exculpatory breath test evidence, and then falsely testifying in order to sustain Hambrick's false claim that Ankele did not cooperate by providing breath samples.[8] On the other hand, Hambrick argues that

---

[8] In Pennsylvania, refusing to provide a breath sample is grounds for a one year suspension of an individual's driver's license. See 75 Pa. Cons. Stat. Ann. § 1547(b).

Ankele has not provided any support for this contention, and claims that he is entitled to absolute immunity.

It is well settled that police officers are absolutely immune from § 1983 suits for damages for allegedly giving perjured testimony at a criminal trial. See Briscoe v. LaHue, 460 U.S. 325, 344-49 (1983); see also Ernst v. Child and Youth Servs., 108 F.3d 486, 494 (3d Cir.) (reviewing Supreme Court precedents on absolute immunity and noting that judges, prosecutors, and witnesses "are entitled to absolute immunity when they perform judicial or quasi-judicial acts that are integral parts of the judicial process"), cert. denied, 522 U.S. 850 (1997). The Third Circuit has extended this principle to the pretrial stage of the judicial process, which would include a preliminary hearing. See Williams v. Hepting, 844 F.2d 138, 141 (3d Cir. 1988). To the extent Ankele seeks damages arising from Hambrick's testimony at his preliminary hearing or trial, Hambrick is entitled to absolute immunity, and thus summary judgment is appropriate.

Plaintiff's Complaint and his Opposition to Hambrick's Motion for Summary Judgment, however, focus on Hambrick's alleged destruction of evidence in furtherance of his goal of depriving Ankele of his driver's license, and his subsequent false testimony at the License Suspension Appeal hearing. See Complaint ¶¶ 13-22; Plaintiff's Opposition at 19-20. Ankele offers no authority for the proposition that absolute immunity should not extend to a civil proceeding such as a license revocation hearing. To be sure, adjudications in an administrative setting share many of the characteristics of the judicial process, including the protections of due process. See Butz v. Economou, 438 U.S. 478, 512-13 (1978) ("We think that adjudication within a federal administrative agency shares enough of the characteristics of the judicial process that those who participate in such adjudication should also be immune from suits for damages."); see also Mackey

v. Montrym, 443 U.S. 1, 19 (1979) ("a person's interest in his driver's license is property that a state may not take away without satisfying the requirements of the due process guarantee of the Fourteenth Amendment").  In both judicial and administrative proceedings, the police officer is performing his public duty, and permitting a subsequent suit against him "might undermine not only their contribution to the judicial process but also the effective performance of their other public duties." Brisco, 460 U.S. at 343.  Because a license revocation hearing is judicial in nature, the same immunity applies.  See Ernst, 108 F.3d at 495 (in determining whether conduct is entitled to immunity, courts must look for a "functional tie" between the conduct and the judicial process) (quoting Buckley v. Fitzsimmons, 509 U.S. 259, 271-72 (1993)).  Accordingly, Ankele is precluded from pursuing his due process claim on the basis of Hambrick's allegedly false testimony at the license revocation hearing.[9]

That leaves only the issue of whether Ankele's claim against Hambrick for allegedly destroying exculpatory evidence may proceed.  When Hambrick was operating the Intoximeter Alco-Sensor IV, he was carrying out his duties as an investigator, "and an investigator searching for clues" is not entitled to absolute immunity.  Ernst, 108 F.3d at 495.  Therefore, the allegation that he destroyed exculpatory evidence by discarding the receipts from the machine is considered under a qualified, as opposed to absolute, immunity analysis.

Under Saucier, the Court must first ask whether the facts alleged, taken in the light most

---

[9] The Court observes that when law enforcement officers lie under oath in a judicial proceeding, the defendant is not the only victim.  Such a heinous transgression is a violation of the public trust, and demeans law enforcement and the courts in the eyes of the community.  It inflicts grave injury to the legitimacy of the rule of law itself, and thus to the well being of an ordered society.  The Supreme Court has prohibited civil actions against individuals who subvert these considerations in favor of their own immediate interests, and it has justified such a rule in this context at least in part on the notion that criminal prosecution is the appropriate recourse against those who offer perjured testimony.  See Briscoe, 460 U.S. at 345 n.32.

favorable to Ankele, show that Hambrick's conduct violated a constitutional right. 533 U.S. at 201. Ankele's memorandum of law provides no assistance to the Court in this regard. However, it is a settled principle that the "Due Process Clause of the Fourteenth Amendment requires the State to disclose to criminal defendants favorable evidence that is material either to guilt or to punishment." California v. Trombetta, 467 U.S. 479, 480, 485 (1984) (even in the absence of a request for exculpatory evidence, the prosecution "has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt"); Brady v. Maryland, 373 U.S. 83 (1963). To meet this standard of "constitutional materiality," the evidence must "possess an exculpatory value that was apparent before the evidence was destroyed," and it must be of such a nature "that the defendant would have been unable to obtain comparable evidence by other reasonably available means." Trombetta, 467 U.S. at 489. In addition, there must be a showing of bad faith on the part of the police in failing to preserve the potentially useful evidence; mere negligence does not support a due process violation. See Arizona v. Youngblood, 488 U.S. 51, 58 (1988).

Ankele contends that he complied with Hambrick's directions, and that he provided four or five adequate breath samples, and that the machine was printing a single result receipt each time he blew into it.[10] Hambrick lied to him, he contends, by telling him that it did not register a reading. He further alleges that Hambrick destroyed the results of these tests because they were exculpatory. Ankele Dep. at 49-52. These actions were purportedly carried out in order to later sustain a false

_____

[10]Ankele's description of how the machine operates is contradicted by Defendant's expert report on the machine's normal function, authored by State Police Corporal Kathy-Jo Winterbottom, an Intoximeter Maintenance Officer. See Winterbottom Report at 1-2, attached to Defendant's Motion. The Winterbottom Report explains that the machine will not print out a receipt after each breath, but only after "a properly run test sequence is complete," at which point the machine "automatically" prints out three copies of the results.

claim that Ankele did not cooperate in providing breath samples.  Plaintiff's Opposition at 20.  Of course, the inference pressed by Ankele is that the discarded slips contained exculpatory evidence, *i.e.*, blood-alcohol content readings below the proscribed level for drivers in Pennsylvania (0.10%, see 75 Pa. Cons. Stat. Ann. § 3731(4)(i)), and that Hambrick violated Ankele's rights by failing to turn them over.  Instead, contends Ankele, Hambrick later testified that Ankele refused to provide a breath sample, and explained the lack of a receipt reflecting that fact by stating that "there are instances when the instrument does not provide a receipt if samples are not - adequate samples are not provided."  License Appeal at 26.[11]

There is no question that the discarded slips of paper, if Ankele's evidence is to be believed, possessed an "exculpatory value that was apparent before the evidence was destroyed."  Trombetta, 467 U.S. at 489.  If, as Ankele contends, he was not intoxicated, then the result slips would have reflected a blood-alcohol content below the legal limit.  Accordingly, the first prerequisite to Trombetta's "constitutional materiality" test is met.  Id.

Turning to the second prong, it also the case that Ankele "would have been unable to obtain comparable evidence by other reasonably available means."  Id.  As an arrestee detained at the police barracks, Ankele would not have been free to leave, and would have had no access to any means (technological or otherwise) that could have provided him with comparable evidence.  Accordingly, the second element is satisfied as well.

Plaintiff's allegations also satisfy the bad faith requirement.  Indeed, Plaintiff's entire case

---

[11] The Winterbottom Report elaborates on Hambrick's contention by explaining that there are two occasions when the machine does not print a result receipt: "if the 'off' button is depressed during the test sequence," and "if the mouthpiece is ejected" prior to completion of the test sequence.  However, this explanation is contradicted by the Alco-Sensor IV/RBT IV Manual, which states that the "OFF button is not operational during the subject test sequence."  Manual at 10, attached to Plaintiff's Appendix at Ex. 7.

rests on a theory that Hambrick "intentionally railroaded Ankele without any reason to believe Ankele was drunk." Plaintiff's Opposition at 9. If Ankele's version of events are credited, the exculpatory value of this evidence would be manifest to any reasonable police officer acting in good faith. See Griffin v. Spratt, 969 F.2d 16, 20 (3d Cir. 1992) (bad faith determination turns on police's knowledge of exculpatory value of the evidence at time it was destroyed). In addition to his own testimony, Ankele presents a host of evidence to support this claim, first and foremost being Hambrick's inconsistent testimony on the issue of whether Ankele refused to provide a sample, whether Ankele ever provided an adequate sample, the normal functioning of the machine, and whether another officer was present during the tests.

Turning to the second prong of the Saucier analysis, there is no question that it "would be clear to a reasonable officer" that it is illegal to destroy an exculpatory blood-alcohol content test result when investigating a DUI charge. 533 U.S. at 202. See Trombetta, 467 U.S. at 480 (even in the absence of a request for exculpatory evidence, the prosecution "has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt"); Brady, 373 U.S. 83. And under these circumstances, Hambrick cannot in any way establish that he "mistakenly but reasonably believed that his actions were constitutionally permissible." Hung, 2002 WL 31689328, at *2. Taking the evidence in the light most favorable to Ankele, there are genuine issues of material fact as to whether Hambrick correctly perceived all of the relevant facts but had a mistaken understanding as to whether discarding the result receipts was constitutional, or that he had reasonable, but mistaken beliefs that facts permitted him to discard the result receipts. See id. Accordingly, Hambrick's Motion is denied, and it will be for a jury to decide if Ankele's evidence can sustain a violation of the Due Process clause.

An appropriate Order follows.

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| **ADAM ANKELE** | : | |
| **Plaintiff** | : | **CIVIL ACTION** |
| | : | **No. 02-4004** |
| **v.** | : | |
| | : | |
| **MARCUS HAMBRICK** | : | |
| **Defendant** | : | |
| | : | |

## ORDER

**AND NOW**, this ___th day of May, 2003, upon consideration of Defendant's Motion for Summary Judgment [Doc. # 7], Plaintiff's Opposition thereto [Doc. # 8], Defendant's Reply [Doc. # 9], and for the reasons set forth in the attached Memorandum Opinion, it is hereby **ORDERED** that Defendant's Motion is **GRANTED IN PART** and **DENIED IN PART** as follows:

1.  Defendant's Motion is **GRANTED** as to Count 2 of the Complaint, and judgment is hereby **ENTERED** in favor of Defendant and against Plaintiff on Count 2 of the Complaint;

3.  Defendant's Motion is **DENIED** as to Count 1 and Count 3 of the Complaint.

It is so **ORDERED**.

**BY THE COURT:**

_____

**CYNTHIA M. RUFE, J.**
