**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

ADAM ANKELE,                         :        CIVIL ACTION
            Plaintiff               :
                                     :
        vs.                          :        No. 02-4004
                                     :
MARCUS G. HAMBRICK,                  :
            Defendant                :        JURY TRIAL DEMANDED

## <u>ORDER</u>

AND NOW this _____ day of _____, 2003, upon consideration of

Defendant's second motion for summary judgment, IT IS ORDERED that the motion is

DENIED.


**BY THE COURT:**


_____

**CYNTHIA M. RUFE, J.**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ADAM ANKELE, | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| vs. | : | No. 02-4004 |
| | : | |
| MARCUS G. HAMBRICK, | : | |
| Defendant | : | JURY TRIAL DEMANDED |

**PLAINTIFF'S BRIEF IN OPPOSITION TO
DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT**

1.    INTRODUCTION

This is Defendant's second motion for summary judgment in this case.  On May 7, 2003, the Court denied Defendant's previous motion for summary judgment as to Counts One and Three of the Complaint.  Summary judgment was entered in favor of Defendant on Count Two.  On May 13, 2003, the Court entered an Interim Scheduling Order, granting Plaintiff's motion to file an Amended Complaint.

Plaintiff did file an Amended Complaint, and Defendant has filed another motion for summary judgment, on all Counts of the Complaint, including those that have already been decided by the Court.  The Court's prior Orders have been vacated by operation of the Interim Scheduling Order of May 13, 2003, combined with Defendant's filing of the motion for summary judgment.

For the reasons recited in the Court's May 7, 2003 Opinion and Order, and for the foregoing reasons, Defendant's second motion for summary judgment should be denied.

2.    STATEMENT OF FACTS

**A.    PLAINTIFF'S ANSWER TO DEFENDANT'S STATEMENT OF FACTS**

1.    Admitted.

2.    It is admitted that Ankele drank three ten ounce glasses of beer while at the Rittersville Fire Company on that day between 4:00 pm and 6:00 pm.  It is denied that Plaintiff had anything other than those three glasses of beer to drink on that day.  See Plaintiff's Dep. at 16, lines 13-14; Ankele Trial Testimony at 26, lines 17-22.  It is admitted that Plaintiff's place of work is very close to the Rittersville Fire Company.  See Ankele Dep. at 11, lines 18-21.

3.    Admitted.

4.    Denied.  Plaintiff pulled his car into the parking lot of the Kuhnsville Inn, which is 15 feet from the accident site.  See Ankele Dep. at 32 line 21 to 33 line 3.

5.    Denied.  Plaintiff did not leave the scene of the accident.  He pulled his car into a nearby parking lot to get it out of the middle of the road. See Ankele Dep. at 32 line 21 to 33 line 3.  It is admitted that Plaintiff interacted with Weider in the parking lot. See Ankele Dep. at 35, line 23 to 36, line 10.

6.    Denied.  Weider did not testify that Ankele's driving was out of control.  Rather, he testified that Ankele's car was out of control prior to impact because the brakes on Ankele's car locked up:

> A.  Right.  I heard the brakes lock up.  He was completely out of control.  Hang to this lane and then he swerved back to the other lane and he let his foot off the brake to get composure and before he could hit the brakes again, he hit the rear of the Saturn.

Weider Trial Testimony at 6, lines 6-11.  It is admitted that Weider characterized the damage to the back of the Saturn onl as "heavy".  <u>See</u> Weider Trial Testimony at 6, lines 17-20.  It is admitted that Weider characterized the car as a "total loss."  <u>See</u> Weider Trial Testimony at 12, lines 20-22.  It is denied that Ankele attempted to leave the scene or evade Mr. Weider, or that he had any discussion with Weider about drinking or losing his license.  <u>See</u> Ankele Dep. at 35, line 19 to 36, line 10; Ankele Dep at 74, lines 14-20.  It is denied that Weider offered any objective facts that would support the conclusion that Ankele was drinking.  <u>See</u> Weider Trial Testimony at 25, line 18 to 28, line 4.

7.    Admitted.

8.    Denied.  Plaintiff was not walking with a staggered gait, and did not having any difficulty walking across the street to the accident scene.  <u>See</u> Ankele Dep. at 38, lines 12-14.

9.    Admitted.

10.    Denied.  Plaintiff did not smell of alcohol when speaking to Trooper Hambrick.  <u>See</u> Ankele Dep. at 104, lines 2-4.  It is admitted only that Ankele told Hambrick that he had a couple of beers.  <u>See</u> Ankele Dep. at 69, lines 17-19.  It is denied that Ankele spoke to Mr. Weider about drinking.

11.    Denied.  Ankele was not belligerent, or cursing and yelling.  <u>See</u> Ankele Dep. at 41, lines 1-4 (Ankele said only "what the f are you going, I was just in an accident" as he was being thrown on the hood of the police car and handcuffed); Weider Trial Testimony at 24, lines 5-14 (Ankele was polite).

12.    Admitted.

13.     Denied.  Hambrick has testified previously under oath that Ankele never gave even one valid breath sample.  <u>See</u> License Suspension trans. at 30-31 ("the first time [Ankele] attempted to give a sample he did not blow into the instrument to give a sufficient sample.").

14.     Denied.  Ankele attempted to, and did, provide valid samples of his breath at the Fogelsville Barracks.  <u>See</u> Ankele Dep. at 53-55.

15.     It is admitted that "at some point" Hambrick turned off the breathalyzer machine.  <u>See</u> Hambrick Dep. at 65, lines 19-20.

16.     Denied.  The breathalyzer machine did print out slips after Ankele provided breath samples.  <u>See</u> Ankele Dep. at 55, lines 18-21.

17.     Admitted.

18.     Denied.  Ankele called Christman, the bartender than night, to tell him that he was being charged with DUI, and to ask how many drinks he had.  <u>See</u> Ankele Dep. at 20, lines 16-18.  It is admitted that Ankele picked up his truck the next day.

19.     Admitted.

20.     It is admitted that a criminal information was prepared by the District Attorney's office.  It is denied that Ankele's criminal defense counsel waived any issues. It is admitted that Ankele was found not guilty of any crime with which he was charged.

21.     Admitted that Ankele prevailed at the license suspension hearing.

## B.    ANKELE'S STATEMENT OF FACTS IN THE LIGHT MOST FAVORABLE TO HIM

The record, reviewed in the light most favorable to Plaintiff, reveals the following:

On February 12, 2001, Plaintiff was working the 7 a.m. - 3:30 p.m. shift at Rob-Win Press.  See Plaintiff's Dep. at 8.  Plaintiff had held this job for 19 years.  See Plaintiff's Dep. at 6.  On that day, Plaintiff stayed at work until 4 p.m., because he was gathering funeral cards for a friend who's wife had passed away.  See Plaintiff's Dep. at 9.  Plaintiff was supposed to meet his friend, Kevin Kasten, to deliver the funeral cards after work.  They were supposed to meet at the Rittersville Fire Company, in order to give Mr. Kasten the funeral cards.  See Plaintiffs Dep. at 11.

### PLAINTIFF CONSUMES A SMALL QUANTITY
### OF BEER OVER AN HOUR AND A HALF PERIOD

Plaintiff waited until 5:30 p.m., but Mr. Kasten never came to meet him.  See Plaintiff's Dep. at 15.  Plaintiff testified that during that period, he had three ten-ounce glasses of beer.  See Plaintiff's Dep. at 16.

The bartender confirmed this testimony.  Jonathan Christman testified that Plaintiff drank three ten-ounce glasses of beer.  See Christman N.T. at 10.  Christman remembered that Plaintiff arrived at the bar between 4:00 and 4:15 p.m. (Christman N.T. at 7) and they walked out the door together at 6:00 p.m., at the conclusion of Christman's shift.  See Christman N.T. at 7.

The uncontradicted evidence is that Plaintiff drank three ten-ounce glasses of beer over a one and a half to two hour period.  Christman, who observed Plaintiff at 6:00 p.m., testified that Plaintiff was not visibly intoxicated or slurring his words at 6:00 p.m. that day.  See Christman N.T. at 10-12.  Although Christman gave a subsequent deposition, he re-affirmed his state court trial testimony as accurate.  See Christman Dep. at 47.

### PLAINTIFF IS IN A REAR-END
### AUTOMOBILE ACCIDENT ON THE WAY HOME

Plaintiff got into an automobile accident on his way home. The accident occurred at approximately 7:00 p.m. <u>See</u> Hambrick Dep. at 10. Plaintiff admitted the accident happened because he was not paying attention to the road in front of him. Plaintiff's speed at impact was 15-20 mph. <u>See</u> Plaintiff's Dep. at 26.

Because his vehicle came to rest in the center of the road, Plaintiff pulled his vehicle into the parking lot of a business across the street from the accident, the Kuhnsville Inn. <u>See</u> Plaintiff's Dep. at 27.

Plaintiff exited his car, and sat on the curb to compose himself after the accident. <u>See</u> Plaintiff's Dep. at 28. Trooper Hambrick arrived on the scene shortly thereafter, and Plaintiff walked back across the street to the accident scene. <u>See</u> Plaintiff's Dep. at 28.

## HAMBRICK ARRESTS PLAINTIFF FOR NO REASON

As soon as Plaintiff got to the accident scene, Hambrick asked Plaintiff if he was the other driver in the accident.

> Q. So you came back to the accident scene where the impact happened. Tell me then what transpired. Did you have any conversation with the trooper?
>
> A. All he said to me was asked me if I was the other person involved in the accident.
>
> Q. How far away were you to him (sic) when that conversation happened?
>
> A. He was walking towards me, and this was like as soon as I told him yes, I was, he grabbed me and threw me on the back of the car, ripped everything out of my pockets, and immediately handcuffed me and put me in the back of the car.

<u>See</u> Plaintiff's Dep. at 40.  Crucially, a neutral and detached witness, Michael Wieder, who was called as a witness by the Commonwealth at Plaintiff's criminal trial, confirmed Plaintiff's version of events:

> Q.  Okay.  Did you see any of that conversation [between Ankele and Hambrick]?
>
> A.  No, I was like fifteen feet away, but everybody else was talking to me and I just like – like I don't know.  By the time I turned around, he was already in handcuffs.  Well, he wasn't in handcuffs yet, he was on the hood of his car emptying his pockets.

<u>See</u> Wieder N.T. at 28.  Plaintiff was arrested, in handcuffs and in the police car, before any warrant was prepared by Hambrick.

### <u>ANKELE EXHIBITED NO SIGNS OF INTOXICATION</u>

After Plaintiff parked his car in the Kuhnsville Inn, Michael Wieder, a neutral and detached witness, crossed the street to check on Plaintiff.  Wieder walked with Plaintiff back across the street to the accident scene.  <u>See</u> Plaintiff's Dep. at 36.

Wieder testified he smelled no alcohol on Plaintiff's breath, even though Wieder was within arm's length.  <u>See</u> Wieder N.T. at 26 ("Q.  So, you were at arm's reach at some point?  A.  Yeah, which is about three feet.  Q.  Okay, and you didn't smell any alcohol?  A.  No.")

Wieder testified that Plaintiff's speech was not consistent with being affected by drinking.  <u>See</u> Wieder N.T. at 26-27 ("Q.  And he appeared to be speaking clearly to you?  A.  Well, he wasn't – he was rambling.  Like some of the things I couldn't understand what he was saying.  Q.  And the rambling you believed to be caused by being upset.  Correct?  A.  Possibly.  Yeah.  Q.  Okay.  Did you think the rambling was from him drinking?  A.  No.").

Wieder also confirmed that at all times, Plaintiff was polite to him.  See Wieder N.T. at 24 ("A.  No.  He was actually kind of cool.  Q.  Kind of cool?  A.  Yeah, he was.  He was ---.  Q.  He was polite?  A.  Yeah.  Q.  Okay.  He wasn't verbally abusive towards you?  A.  No.").

Finally, Wieder testified that he observed nothing unusual about the way Plaintiff was walking.  See Wieder N.T. at 31-32.

In fact, Plaintiff exhibited no signs of intoxication or odor of alcohol at the time his wife and in-laws picked him up form the barracks, at the conclusion of the encounter.  See Diane Ankele N.T. at 6-7.

## HAMBRICK USES MORE FORCE THAN NECESSARY TO TAKE ANKELE INTO CUSTODY

After Ankele crossed the street to the accident scene, Hambrick grabbed Ankele, and slammed him onto the hood of the police car:

> Q.  When you say he put you on the back of the car, what do you mean?
>
> A.  Well, he grabbed me and slammed me on the car.
>
> Q.  The hood?  The trunk area?  Where?
>
> A.  The hood.
>
> Q.  And you're saying he slammed you down.  Did some part of your body have some impact with the car?
>
> A.  My whole – my chest and my arms, yes.

See Plaintiff's Dep. at 42.

In fact, Hambrick agrees that he pushed Ankele onto the hood of his police car:

> I asked him to put his hand on the vehicle, and I explained to him that I was going to check him to ensure that he didn't have any weapons.  I asked him if he had any weapons.  He said no.  I began

to pat down the outside of his pockets, and he at that point began to
stand up and spin away from me. I then grabbed both of his hands,
leaned my chest against his back, and leaned him over the hood of
the car and handcuffed him.

<u>See</u> Defendant's Dep. at 25-26.

Hambrick agreed that he did this <u>even though</u> Hambrick agrees that Ankele's

hands never left the hood of the police car.

Q. Okay. So he never moved his hands?

A. No. I moved his hands.

<u>See</u> Defendant's Dep. at 27.

Plaintiff clearly articulated that Hambrick slammed him into the police car for no

reason.

## <u>HAMBRICK'S DEPOSITION TESTIMONY IS<br>AT SIGNIFICANT VARIANCE WITH HIS PRIOR TESTIMONY</u>

1.     <u>Adequacy of Breath sample given by Ankele</u>

At Hambrick's deposition, he claimed that Ankele gave one breath sample that

registered at .248% alcohol. <u>See</u> Hambrick Dep. at 57. He also claimed that Ankele

refused to provide additional samples. <u>See</u> Defendant's Dep. at 60-61.

Hambrick is unable to produce any documentation for the refusal.

This deposition testimony is at an unacceptable variance with prior sworn

testimony given by Hambrick. At the license suspension hearing, Hambrick testified that

Ankele <u>never</u> gave a sufficient sample:

Q. Okay. What did Mr. Ankele do when you handed him the tube?

A. He placed the tube in his mouth. And he did not – the first time
he attempted to give a sample he did not blow into the instrument to
give a sufficient sample. The second time ---

Q.   Physically, what was he doing when he was blowing – blowing into the tube?

A.   Not – he physically was blowing – you can – he did not seal his mouth around the tube in the manner described to him so that he was able to put the air into the instrument to give an adequate sample.

See License Susp. App. Trans. At 30-31.

These two diametrically opposed versions of events from a Pennsylvania State Trooper under oath are stunning.  When trying to have Ankele's license suspended for failure to give a breath sample, Hambrick claimed that Ankele gave zero samples.

In this litigation, when he is being sued for arresting Ankele for no reason, inter alia, Hambrick claims that Ankele did give a sample, and that sample showed Ankele was severely intoxicated.

2.    Hambrick claims about how the breathalyzer machine works.

At the license suspension appeal, Hambrick testified that the breathalyzer machine would not print out a slip automatically upon a refusal to submit a sample:

A.   If two adequate breath samples are supplied the instrument will provide a reading.

Q.   And if they're not, it'll read insufficient sample and it'll still print something out, correct?

A.   There are occasions when it does not.

Q.   In this instance, did it, or did it not?

A.   It did not.

Q.   Okay.  Why not?

A.   I don't know.

Q.   Isn't that a malfunctioning then if it did not register or make a slip?

> A.   No.
>
> Q.   Why not?
>
> A.   Again, there are instances when the instrument does not provide
> a receipt if samples are not – adequate samples are not provided.

See License Susp. App. Trans. at 26.  There is no question today that this testimony is not

true.  See Hambrick Dep. at 70 (acknowledging that every properly run test should result

in the machine printing out three slips), at 73 (acknowledging he made a mistake).

Hambrick now claims that, rather than push the refusal button, or wait for the

machine to time-out, and print a refusal slip, he turned the machine off.  See Hambrick

Dep. at 74, 80.

Ankele claims that the machine was printing out slips, but Hambrick told him

they did not contain a reading.  See Ankele Dep. at 51.

Even a cursory examination of the breathalyzer manual calls Hambrick's

explanation that he turned the machine off into question.  The manual provides that the

OFF button operates as follows:

> OFF     The off button turns the power off.  The RBT IV will
> beep and turn off automatically if it remains idle more
> than several minutes.  The OFF button is not operational
> during the subject test sequence.

See Alco-Sensor IV/RBT-IV manual, pages 9-10.  The Alco-Sensor manual itself

contradicts Corporal Winterbottom's report on the operation of the machine.

On this record, there is serious doubt about whether Hambrick "made a mistake"

by turning the machine off, or whether he intentionally railroaded Ankele without any

reason to believe Ankele was drunk.

3.     Hambrick also changed his story about a witness to the supposed refusal.

At Ankele's preliminary hearing on the drunk driving charge, Hambrick claimed another Trooper was present during Ankele's use of the machine:

> Q.  Was anybody else present when Mr. Ankele was attempting to utilize the machine?
>
> A.  Yes.  There was another Trooper present [, Trooper Campbell.]
>
> Q.  Was he present the whole time?
>
> A.  The whole time of what, sir?
>
> Q.  The whole time that Ankele was attempting to utilize the instrument?
>
> A.  Yes.

<u>See</u> Prelim. Hearing Trans. at 22.  Again, Hambrick's deposition testimony was in direct contradiction:

> Q.  Did Trooper Campbell witness any of your interactions in the room with the RBT [breathalyzer]?
>
> A.  A small portion of it, yes.
>
> Q.  So, Trooper Campbell was not there the whole time?
>
> A.  No.

<u>See</u> Hambrick Dep. at 51.  Hambrick's divergent testimony is very troubling.

<u>4.    Hambrick never even tried to give Ankele field sobriety tests</u>

At Hambrick's deposition, Hambrick claimed that he asked Ankele to perform field sobriety tests.  <u>See</u> Hambrick Dep. at 23.  Hambrick claimed that he frisked Ankele prior to beginning the field sobriety tests, as is his routine practice.  <u>See</u> Hambrick Dep. at 25.  It was during this frisking when Ankele, with his hands still on the police car (<u>see</u> Hambrick Dep. at 27), made some movement that Hambrick determined as threatening,

justifying Ankele being pushed down onto the police car and handcuffed.  <u>See</u> Hambrick

Dep. at 28.

In actual fact, this is a false predicate:  Hambrick never tried to administer field

sobriety tests to Ankele.  Hambrick testified at the preliminary hearing that field sobriety

tests were not necessary.

> Q.   Did you have him do any field tests at the scene?
>
> A.   No.
>
> Q.   Why not?
>
> A.   I felt that I had enough to ask him to come back to Fogelsville to submit to a breath test coupled with the fact that he was involved in the crash, his demeanor, gait, bloodshot eyes, and moderate odor of alcohol.  Coupled with the fact that he was being difficult, I wanted to because of this crash, determine if alcohol and alcoholic beverages had played a part in it.

<u>See</u> Prelim. Hearing Trans. at 16.

The conflicts in Hambrick's testimony are troubling.

## <u>HAMBRICK'S POLICE CAREER IS MARKED<br>BY POOR DECISIONS AND A BAD TEMPER</u>

In 1994, while still a State Police cadet, Hambrick was involved in a physical

altercation with another cadet:

> The investigation revealed that cadets Guthrie and Hambrick were involved in an incident of quarreling and fighting.  The incident was precipitated as both parties directed insulting language towards one another.   The only physical contact involved Cadet Hambrick pushing Cadet Guthrie.

<u>See</u> July 11, 1994 State Police Memo.  Hambrick disputed this version of the incident,

but admitted he initiated physical contact with the other cadet.  Hambrick explained:

> Q.   Okay.  Do you remember why you did that?

13

A.   I was making a point.

See Hambrick Dep. at 122; see also Hambrick Dep. at 120.

For the time period of June 2000 to June 2001, Hambrick received an "Unsatisfactory" rating (lowest available) for Work Habits.  Several citizens complained about Hambrick's verbal abuse while Hambrick was on duty.  Hambrick signed this evaluation that he agreed with his rating.  See Hambrick Dep., Exhibit 1.  Hambrick also agreed with his June 2001-2002 evaluation, criticizing his handling of the Ankele case, and again rating his overall performance as Needs Improvement.  See Evaluations.

At first blush, it seems curious that Hambrick would grab Ankele, a stranger, slam him into a police car, and arrest him for no reason.  A look at Hambrick's background explains that he frequently treats people he encounters with an unprofessional demeanor.

Hambrick acknowledges in his evaluations that his performance needs to improve.  However, at his deposition, Hambrick claimed that he did protest his rating to a supervisor.  See Hambrick Dep. at 113-115.

### GENUINE ISSUES OF
### MATERIAL FACT EXIST

Viewing the evidence in the light most favorable to Plaintiff, there are ample genuine issues of material fact, and Defendant's second motion for summary judgment should be denied.

III.    ARGUMENT

**A.    HAMBRICK HAD NO PROBABLE CAUSE TO ARREST PLAINTIFF FOR ANY OFFENSE**

1.    Hambrick charged Plaintiff with three offenses.  Hambrick arrested Plaintiff for three offenses.  (1) driving while under the influence of alcohol to a degree

which rendered him incapable of safe driving, 75 Pa.C.S.A. § 3731(a)(1); (2) leaving the

scene of an accident, 75 Pa. 75 Pa.C.S.A. § 3743(a); and (3) driving at an unsafe speed,

75 Pa.C.S.A. § 3361. Defendant did not have probable cause to believe that Plaintiff

committed any of these offenses. <u>See</u> Ankele Dep., Exhibit Ankele-1 (Police Criminal

Complaint & Affidavit of Probable Cause).

   2. <u>Hambrick had no probable cause to arrest Plaintiff for drunk driving.</u>

Under the totality of the circumstances, Defendant did not have probable cause to arrest

Ankele for drunk driving. According to Ankele, after he got his car out of the middle of

the road, he walked across the street to the accident scene where Hambrick had just

arrived. <u>See</u> Ankele Dep. at 27. Hambrick asked Ankele if he was involved in the

accident, Ankele said yes he was, and Hambrick immediately arrested him. <u>See</u> Ankele

Dep. at 40-41 ("And as soon as I told him yes, I was, he grabbed me and threw me on the

back of the car, ripped everything out of my pockets, and immediately handcuffed me

and put me in the back of the car.") This sequence is confirmed by the neutral witness,

Mr. Wieder. <u>See</u> Wieder N.T. at 28 ("By the time I turned around, [Ankele] was already

in handcuffs. Well, he wasn't in handcuffs yet, he was on the hood of his car emptying

his pockets.") During this short sequence of events, Hambrick could not have gleaned

any information relative to Ankele's level of intoxication, and whether Ankele was too

intoxicated to drive a car.

   According to Hambrick's deposition testimony, Hambrick believed Ankele was

intoxicated due to the following factors: "staggered gait, red, bloodshot eyes, an odor of

alcoholic beverage about his breath and person, he was involved in a crash [and]

extremely difficult and belligerent, and he was using profanity." See Hambrick Dep. at 42. On the summary judgment record, none of these factors can be credited.

Plaintiff contends he was not intoxicated at all. See Plaintiff's Dep. at 29. Plaintiff contends that he had no difficulty walking back to the scene. See Plaintiff's Dep. at 38. The neutral witness at the scene, Mr. Wieder, did not notice anything unusual about Plaintiff's walking, and if fact, at a point desribed Ankele as "bolting" into traffic. See Wieder N.T. at 31-32. This is completely inconsistent with the "unsure footing" as described by Trooper Hambrick. See Hambrick Dep. at 13.

Plaintiff did not have occasion to observe his own eyes, obviously. However, Plaintiff does know that it was completely dark at the time of the accident (see Plaintiff's Dep. at 104), and that Hambrick observed him for only a matter of seconds before arresting him. Furthermore, attesting to the normal variation in human beings eye coloring, defense counsel admitted during Plaintiff's deposition that Plaintiff's eyes seemed somewhat bloodshot even then. See Plaintiff's Dep. at 106 ("Q. Frankly, your eyes look a little red and bloodshot right now.").

Both Plaintiff and the neutral witness, Mr. Wieder, denied that Plaintiff had an odor of alcohol on Ankele's breath or person. See Plaintiff's Dep. at 70, 104; Wieder N.T. at 26 (did not smell alcohol on Ankele from a distance of three feet). Plaintiff does admit that he was in a automobile accident at the scene.

Ankele also denied using profanity on the scene prior to being arrested. Ankele does admit that after he was slammed on the hood of the police car, he did say "Are you fucking crazy, I was just in an accident." See Plaintiff's Dep. at 46. Otherwise, Plaintiff did not curse at the officer, or provide him with any resistance whatsoever. See Ankele

Dep. at 45-46.  This is consistent with the testimony of Mr. Wieder, who described

Ankele's demeanor as "cool" and "polite."

In a similar case, the U.S. Court of Appeals for the Second Circuit held that

contradictory evidence about the supposed "factors of intoxication" relied upon by the

police officer is sufficient to defeat summary judgment in an illegal arrest case.

> Further, the existence of probable cause is to be determined on the
> basis of the totality of the circumstances, and we cannot conclude
> that it would have been objectively reasonable as a matter of law for
> Katz to infer intoxication solely from the redness of Kent's eyes,
> while ignoring as a possible cause of discoloration the fact that Kent
> had been burning brush for the past 18 days, and from Kent's
> statement that he had not been drinking very much, while ignoring
> all other comportment that might reflect on the state of Kent's
> sobriety. And indeed, Katz himself, in his [probable cause] Affidavit
> in support of his assertion that he had "probable cause to believe"
> that Kent had been intoxicated, did not ignore other circumstances.
> He included the assertions that he had observed Kent walking
> unsteadily, swaying, slurring his speech, and smelling of alcohol. A
> factfinder, however, would not be required to credit Katz's
> assertions as to his observations and could instead believe Kent and
> his witnesses whose evidence as to Kent's actions and appearance
> was squarely to the contrary. Thus, the totality of the circumstances
> cannot be determined as a matter of law but must await resolution of
> the factual issues.

See Kent v. Katz, 312 F.3d 568, 576 (2nd Cir. 2002).  As in this case, the fact that

Plaintiff admitted he drank a few beers in Allentown (though apparently not relied upon

by Hambrick), and the fact that Ankele's eyes may or may not have been red, is not

sufficient to find probable cause to arrest for drunk driving as a matter of law.  In fact, as

in the Kent v. Katz, supra case, the police officer purported to rely on additional factors

to demonstrate that Ankele was drunk.  The other factors are all disputed, not only by

Ankele, but by other witnesses.  Because the factfinder is not obligated to credit

Hambrick's assertions about his observations, this case must be determined by a jury.

Furthermore, the bartender at the club testified that Plaintiff had exactly three ten-ounce glasses of beer, much earlier in the evening before the accident. This is further proof that Plaintiff was not intoxicated as Hambrick claims, and did not have a .248% BAC reading. Plaintiff also denied being intoxicated. For all of these reasons, Hambrick is not entitled to summary judgment.

    3.    <u>Hambrick had no cause to believe that Ankele left the scene of an accident.</u> The uncontradicted evidence is that Ankele was involved in an automobile accident, and thereafter moved his vehicle out of the middle of the road, to a parking lot directly across from the scene of the accident. The very language of the statute itself demonstrates Plaintiff was not at all in violation:

> The driver of any vehicle [involved in a property damage accident] shall immediately stop the vehicle at the scene of the accident or as close thereto as possible but shall forthwith return to and in every event remain at the scene of the accident until he has fulfilled his requirements [of giving information and rendering aid.]

75 Pa.C.S.A. § 3743. According to Hambrick's own testimony, when he arrived at the scene, Ankele was walking across the street towards the scene of the accident scene. <u>See</u> Hambrick Dep. at 7. Shortly after that, Hambrick had Ankele in the police car. There is no suggestion from any evidence that Ankele fled the scene of this accident. Hambrick's suggestion to the contrary is completely without support under the plain reading of the statute. <u>See</u> Hambrick Dep. at 96-97 ("It doesn't matter why. If he's not at the scene he's not there and that's a criminal offense."). In fact, the District Justice found no probable cause to proceed on that charge, and it was dismissed for lack of evidence.

    4.    <u>Hambrick had no reason to believe that Ankele was speeding.</u> Hambrick admitted that no witness to the accident complained about Ankele's speed. <u>See</u>

Hambrick Dep. at 94-95. Hambrick has not pointed to any evidence that is probative of Ankele's speed at any point. In fact, Judge Platt found Ankele not guilty of this summary offense at the trial.

On the version of facts most favorable to Plaintiff, and rejecting the credibility of Hambrick's version, Hambrick had no probable cause to arrest Plaintiff for anything. In fact, Hambrick slammed Plaintiff onto the police car as soon as Ankele got across the street, without asking him anything other than whether Ankele was involved in the accident. For these reasons, Hambrick's motion for summary judgment must be denied.

  5. <u>Hambrick made the arrest for drunk driving alone initially, placing Plaintiff in handcuffs and into the back of his police car.</u> As the Court observed in its Opinion on the first motion for summary judgment, Hambrick does not claim that he arrested Ankele for speeding or leaving the scene of an accident, but focused almost exclusively on his observations relevant to Ankele's intoxication. <u>See</u> Opinion at 11. Hambrick again claims in his brief that he is entitled to summary judgment on the illegal arrest claim because Hambrick concedes that he arrested Plaintiff without witnessing the traffic violations with which he was later charged. Ankele was surely arrested by Hambrick as soon as Hambrick placed handcuffs on Ankele, and put him into the back of the police car. <u>See</u> <u>Kaupp v. Texas</u>, 123 S.Ct. 1843, 1846-47 (2003) (explaining the types of seizures that constitute an arrest for which probable cause is required). There can be no question that Ankele was not, nor would a reasonable person have thought, that he was free to leave under the circumstances that he was presented immediately after the accident: he was handcuffed, put into a police car, and driven the police barracks where he was required to provide a breath sample.

There were <u>never</u> any objective facts to believe that Ankele left the scene of an accident. Hambrick does not claim <u>any</u> knowledge about Ankele's driving speed, either before or after the arrest. The grounds on which Hambrick purports to rely to arrest Ankele at the roadside exclusively focused on Ankele's intoxication. Since there is a genuine issue of material fact about whether Hambrick is telling the truth about the existence of those factors, Defendant's motion for summary judgment on the illegal arrest claim under the Fourth Amendment must be denied.

**B.    PLAINTIFF HAS STATED A CLAIM UNDER THE FOURTH AMENDMENT FOR THE PRETRIAL SEIZURE DURING THE CRIMINAL PROCEEDINGS BEFORE PLAINTIFF WAS ACQUITTED AND FOR DESTRUCTION OF EXCULPATORY EVIDENCE UNDER THE DUE PROCESS CLAUSE**

There can be little question that a claim for the constitutional tort of malicious prosecution is viable under the Fourth Amendment. <u>See</u> <u>Donahue v. Gavin</u>, 280 F.3d 371, 380 (3d Cir. 2002) (post-indictment seizure suffices to state claim for malicious prosecution under the Fourth Amendment). Defendant's contention that Plaintiff was not seized by virtue of being released on bail does not comport with discussion of the issue by the U.S. Court of Appeals for the Third Circuit and Justice Ginsburg:

> Relying on the common law understanding of the purpose of bail, Justice Ginsburg explained in her concurrence in <u>Albright</u> that "the difference between pretrial incarceration and other ways to secure a defendant's court attendance [is] a distinction between methods of retaining control over a defendant's person, not one between seizure and its opposite." 510 U.S. at 278, 114 S.Ct. at 815. Thus, although recognizing that a defendant who is incarcerated pending trial suffers greater deprivation than one released on bail, Justice Ginsburg concluded that even the latter defendant is seized. See <u>Albright</u>, 510 U.S. at 279, 114 S.Ct. at 815-16. She wrote: "Such a defendant is scarcely at liberty; he remains apprehended, arrested in his movements, indeed 'seized' for trial, so long as he is bound to appear in court and answer the state's charges." <u>Albright</u>, 510 U.S. at

20

279, 114 S.Ct. at 816.  We find this analysis compelling and
supported by Supreme Court case law.

Gallo v. City of Philadelphia, 161 F.3d 217, 222-223 (3d Cir. 1998).  Here, there is no

dispute that Plaintiff had to post bail.  See Preliminary Hearing Trans. at 34.  Defendant

has cited no cases that have abrogated the holding in Gallo, relying on Justice Ginsburg's

concurrence in Albright, that the requirement of posting bail amounts to a seizure.  See,

e.g., Mantz v. Chain, 239 F.Supp.2d 486, 502 (D.N.J. 2002) (noting that Plaintiff did not

post bail in holding there was no seizure); Garcia v. Micewski, 1998 WL 547246, *10

(E.D. Pa.) (Plaintiff admitted that no bail was posted).

    1.     The decision to prosecute by the Prosecutor's office does not bar this

claim where Hambrick provided false information to the prosecutor.  The filing of a

Criminal Information by the prosecutor does not, as Defendant claims, break the chain of

causation for a malicious prosecution claim where the police officer deliberately

provided false information to the prosecutor.  See Merrero v. Micewski, 1998 WL

414274, *6 (E.D. Pa.) ("A police officer may only be held to have "initiated" a criminal

proceeding if he knowingly provided false information to the prosecutor or otherwise

interfered with the prosecutor's informed discretion."); Reed v. City of Chicago, 77 F.3d

1049, 1053-54 (7th Cir. 1996).  In this case, Plaintiff has provided ample evidence that the

testimony he provided was not accurate, and that he deliberately railroaded Ankele

without any evidence that he was intoxicated.  In that respect, it is noteworthy that the

prosecutor in the criminal case did not elicit from Hambrick his claims that Ankele

refused to give a breath sample.  See Hambrick Criminal Trial Testimony (attached to

Defendant's second appendix).  The testimony that Hambrick did provide was not

accurate and truthful, and consisted of knowing misstatements.  Thus, the decision to

21

prosecute was not made independently, but based on the false claims of Hambrick, made

for the purpose of inducing the prosecution without probable cause.  Plaintiff has

satisfied the elements of proving the constitutional tort of malicious prosecution:

> In order to state a prima facie case for a section 1983 claim of malicious prosecution, the plaintiff must establish the elements of the common law tort as it has developed over time. See Lee v. Mihalich, 847 F.2d 66, 70 (3d Cir.1988); see also McArdle v. Tronetti, 961 F.2d 1083, 1088 (3d Cir.1992); Singleton v. City of New York, 632 F.2d 185, 195 (2d Cir.1980) (collecting cases), cert. denied, 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 347 (1981). In Pennsylvania, like most jurisdictions, a party bringing a malicious prosecution claim must demonstrate that (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; and (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice.

See Hillfirty v. Shipman, 91 F.3d 573, 579 (3d Cir. 1996).  Here, the evidence viewed in

Plaintiff's favor establishes that (1) Hambrick initiated the prosecution by providing false

statements and claims to the District Attorney; (2) Plaintiff prevailed in all of the

proceedings initiated by Hambrick after a full trial on the merits; (3) Hambrick had no

probable cause to proceed with the prosecution; and (4) Hambrick's motives, as

evidenced by his numerous inconsistent statements, were something other than bringing

Plaintiff to justice.  Therefore, Defendant's motion as to Court Four of the Complaint

ought to be denied.

    3.    Ankele's has stated a claim for Hambrick's destruction of exculpatory

evidence in order to attempt to have Ankele's license suspended.  As discussed at length

in the Court's previous Opinion, Ankele has stated a claim for Hambrick's destruction of

the exculpatory breath test results.  See Opinion at 21-24.  Defendant argues that a claim

for destruction of exculpatory evidence cannot proceed unless the evidence would have

yielded a different result below.  Relying on <u>Strickler v. Greene</u>, 527 U.S. 264 (1999),

and the fact that Plaintiff prevailed below in every respect, Defendant contends that this

claim is barred.  A close reading of <u>Strickler</u>, <u>supra</u>, belies this argument.

<u>Strickler</u>, <u>supra</u>, arises in the criminal context.  Obviously, a criminal defendant

who is acquitted will never be before the Court in a criminal context arguing a <u>Brady</u>

violation that prevented him from defending himself.  The <u>Strickler</u> language relied upon

by the Defendant is the following:

> In <u>Brady</u>, this Court held "that the suppression by the prosecution of
> evidence favorable to an accused upon request violates due process
> where the evidence is material either to guilt or to punishment,
> irrespective of the good faith or bad faith of the prosecution." 373
> U.S., at 87, 83 S.Ct. 1194. We have since held that the duty to
> disclose such evidence is applicable even though there has been no
> request by the accused, <u>United States v. Agurs</u>, 427 U.S. 97, 107, 96
> S.Ct. 2392, 49 L.Ed.2d 342 (1976), and that the duty encompasses
> impeachment evidence as well as exculpatory evidence, <u>United
> States v. Bagley</u>, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481
> (1985). Such evidence is material "if there is a reasonable
> probability that, had the evidence been disclosed to the defense, the
> result of the proceeding would have been different."

<u>Strickler v. Greene</u>, 527 U.S. 264, 280 (1999).  Notably, all of the cases discussed by the

United States Supreme Court in that passage are criminal cases.  In the criminal context,

this means that a <u>Brady</u> violation does not occur unless the evidence withheld indicates a

reasonably probability that the criminal defendant would not have been convicted had the

evidence been disclosed and available.

Defendant's extension of that language to indicate that the withholding of

exculpatory evidence from a criminal prosecution does not violate the Due Process clause

<u>unless</u> the withholding of the evidence results in a conviction makes no sense.  Under that

logic, a police officer who deliberately tried to frame an innocent defendant by

destroying exculpatory evidence would be immune from civil liability if the criminal jury

saw through the machinations of the police officer.  The Supreme Court's discussion of a

<u>Brady</u> violation in the <u>Brady</u> case itself better states the Due Process concerns at issue:

> We now hold that the suppression by the prosecution of evidence
> favorable to an accused upon request violates due process where the
> evidence is material either to guilt or to punishment, irrespective of
> the good faith or bad faith of the prosecution.
> The principle of <u>Mooney v. Holohan</u> is not punishment of society
> for misdeeds of a prosecutor but avoidance of an unfair trial to the
> accused. Society wins not only when the guilty are convicted but
> when criminal trials are fair; our system of the administration of
> justice suffers when any accused is treated unfairly.

<u>Brady v. Maryland</u>, 83 U.S. 1194, 1196-97 (1963).  The thrust of the due process

guarantee is exactly that stated by Justice Brennan: fairness.  Because Defendant unfairly

destroyed exculpatory evidence, if Plaintiff's evidence is believed, Plaintiff has stated a

due process violation.  This violation of Plaintiff's federal constitutional rights is

actionable in a civil suit pursuant to 42 U.S.C. § 1983.  Defendant's taking language from

<u>Strickler</u> (a criminal case) out of context, when it was meant to explain the materiality of

the withheld evidence, cannot defeat summary judgment.  Rather, as observed by the

Court, if Plaintiff's evidence is believed, the exculpatory value of the breath test results

destroyed by Hambrick was manifest.  <u>See</u> Opinion at 23 ("There is no question that the

discarded slips of paper, if Ankele's evidence is to be believed, possessed an

'exculpatory value that was apparent before the evidence was destroyed.' ").  If Ankele

had been convicted on Hambrick's false testimony, the existence of breath tests results

showing that Ankele was not drunk would certainly be the type of evidence that leaves a

reasonable probability that Ankele would not have been convicted of being too drunk to

drive safely.  Because there are genuine issues of material fact in dispute, Defendant's

motion for summary judgment on Court Three of the Complaint should be denied.

**C.    THE SIGNIFICANTLY DISPUTED FACTS FORCLOSE SUMMARY
JUDGMENT ON QUALIFIED IMMUNITY**

Defendant again claims that he is entitled to qualified immunity.  Again,

Defendant has cited no cases suggesting that any of the rights at issue here, that is, the

right to be free from arrest without probable cause, the right to be free of malicious

prosecution, and the right to have exculpatory evidence turned over, were not clearly

established as of the date of the incident giving rise to this suit.  See Opinion at 15, 24.

Defendant also does not suggest that he mistakenly but reasonably believed that his

actions were constitutionally permissible.  See Opinion at 16, 24.  Given the substantial

factual disputes between the parties, this case is not appropriate for a summary

disposition on qualified immunity.  See Bennett v. Murphy, 274 F.3d 133, 137 (3d Cir.

2001) (disputed issues of fact preclude summary judgment on qualified immunity basis);

Russoli v. Salisbury Twp., 126 F.Supp.2d 821, 852 (E.D. Pa. 2000) (same).  Simply

stated, this case involves the violations of well-entrenched constitutional rights that

Plaintiff claims were violated intentionally by Hambrick for a roguish purpose.  This case

does not invoke the protections of qualified immunity for Hambrick, if Plaintiff's

evidence is believed.

IV.     CONCLUSION

For the foregoing reasons, Plaintiff asks that Defendant's motion for summary

judgment be DENIED.

Respectfully submitted,

_____

Richard L. Orloski
Attorney for Plaintiff
111 N. Cedar Crest Blvd.
Allentown  PA   18104-4602
610-433-2363

## CERTIFICATE OF SERVICE

I, undersigned, hereby certify that I served defense counsel with a true a correct copy of Plaintiffs' brief in opposition to Defendant's preliminary objections to the Third Amended Complaint by placing a copy of same in the United States Mail, first-class postage pre-paid, addressed as follows and on the date indicated.

Theodore Lorenz, Esq.
Deputy Attorney General
21 S. 12th St, 4th Floor
Philadelphia PA 19106


DATE: 09/12/03                               _____

                                             Richard L Orloski
                                             Attorney for Plaintiff